# SIXTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 6D2024-2168
Lower Tribunal No. 2018-CA-003559

_____

THE BANK OF NEW YORK as Trustee for the CERTIFICATEHOLDERS CWABS ASSET-BACKED CERTIFICATES, SERIES 2005-BC4,

Appellant,

v.

KEITH HENRY, et al.,

Appellees.

_____

Appeal from the Circuit Court for Osceola County.
Tom Young, Judge.

July 10, 2026

## **EN BANC**

GANNAM, J.

The Bank of New York appeals the trial court's order overruling the bank's objection to a foreclosure sale and denying its motion to vacate the sale. The bank claims irregularities in the sale process caused by the Osceola County Clerk of Court allowed a third-party bidder, appellee Keith Henry, to purchase the foreclosed property for an amount less than the amount owed to the bank on its foreclosure

judgment. According to the record, however, the bank did not make a proper showing that any equitable ground for setting aside the foreclosure sale exists because the bank did not prove any sale irregularity resulting in injustice to the bank. Competent substantial evidence supports the trial court's finding that the clerk did not prevent the bank from bidding at the sale, and the trial court did not abuse its discretion in overruling the bank's objection and denying its motion to vacate the sale. Accordingly, we affirm.[1]

I

In January 2019, the bank obtained a judgment of foreclosure in the amount of $246,488.76, bearing interest at the prevailing legal rate until paid. The judgment provided for the bank's recovery of post-judgment interest and costs through the foreclosure sale:

> [The bank] shall advance all subsequent required costs of
> this action and shall be reimbursed for them by the Clerk

---

[1] A month after the Court voted to determine this appeal en banc, as being a case or involving an issue of exceptional importance under rule 9.331, the bank filed a notice of voluntary dismissal under rule 9.350. The Court declined to dismiss the appeal. *See* Fla. R. App. 9.350(c) ("When a party files a . . . notice of dismissal . . . , the cause may be dismissed only by court order."); *Pino v. Bank of N.Y.*, 76 So. 3d 927, 929 (Fla. 2011) ("[T]his Court has long recognized its discretion to retain jurisdiction over a matter and proceed with an appeal notwithstanding a litigant's timely filing of a notice of dismissal pursuant to rule 9.350, especially when the matter involves one of great public importance and is likely to recur."); *Swift Response, LLC v. Routt*, 401 So. 3d 640, 641 n.1 (Fla. 1st DCA 2025) ("We deny Swift's motion for voluntary dismissal, filed just under two weeks after we took oral argument—after this court already expended considerable judicial labor in this matter." (citing *Pino*, 76 So. 3d at 927)).

2

> if [the bank] is not the purchaser of the property for sale. If [the bank] is the purchaser, the Clerk shall credit [the bank's] bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full.

Recovery of post-judgment costs, however, required additional certification to the clerk:

> If prior to the sale, [the bank] shall be required to advance any monies pursuant to the provisions hereof, then [the bank] or its attorneys shall so certify to the Clerk of this Court, and the amount due to [the bank] . . . shall be increased by the amount of such advances without further order of the Court.

At the 2024 foreclosure sale on the judgment, Henry, as a third-party bidder, won the auction with a bid of $262,500, around $16,000 more than the face amount of the judgment. On the same day, the bank filed an objection to the sale and a motion to vacate it. In the motion to vacate, and at the evidentiary hearing on the motion, the bank argued the sale clerk prevented the bank from bidding an amount comprising the judgment amount plus statutory interest by illegally conditioning the bank's bid on its filing a pre-sale affidavit, and further argued that the affidavit requirement could only apply if the bank's bid included post-judgment costs that the bank had advanced.

The bank's representative at the foreclosure sale was a third-party vendor authorized to act for the bank. She testified at the motion hearing that, on the day of the sale, she submitted the bank's "judgment paperwork" to the sale clerk for review,

3

and the clerk said the bank "would need to file an affidavit for the other amount above our judgment amount." The representative's supervisor testified that she spoke to the sale clerk by phone, and that the clerk said the bank "would not be permitted to bid over its judgment amount." The representative testified that, after her supervisor's call with the sale clerk, the clerk told the representative the bank "would only be allowed to bid up to our judgment amount since we did not have the affidavit on file." The representative testified that, after the sale commenced, she tried to make a bid above the judgment amount but that "we were not recognized."

The sale clerk testified that she had been conducting foreclosure sales in the county for about eight years. Her responsibilities included reviewing the judgment holder's paperwork and verifying the amounts to be bid, and that judgment holders always included affidavits to support bid amounts over the judgment amount. She testified she informed the bank's representative that she could not accept the highest bid amount the bank presented because the bank had not filed an affidavit or motion to increase the bid amount above the amount of the judgment, and that in response, the bank representative told her an affidavit would be filed prior to the sale. Then, the clerk testified, the representative's supervisor told her by phone that the bank wanted to cancel the sale, but the clerk told the supervisor that it was too late to cancel it. Finally, the clerk testified that she recognized the bank's credit bid for the amount of its judgment, that the bank could have made a cash bid above the

4

judgment amount on the same terms as any other bidder, and that she did not refuse to recognize any bid by the bank representative at the sale.

At the conclusion of the hearing, the trial court orally denied the bank's motion to vacate the sale, indicating that the equities favored upholding the sale and the clerk's affidavit requirement despite the bank's argument that the affidavit requirement was contrary to law. In its subsequent written order, the trial court found that the sale clerk "did not bar or otherwise prevent [the bank] from bidding in excess of the Final Judgment amount . . . . However, the Clerk of Court advised the attending representative an affidavit was needed prior to the sale date to bid over the Judgment amount." The written order did not elaborate on these brief findings or otherwise disclose the trial court's reasoning for denying the bank's motion.

## II

On appeal, the bank argues that the trial court abused its discretion by failing to vacate the foreclosure sale due to the irregularities of the clerk's pre-sale affidavit requirement, contrary to the judgment and applicable law, and the clerk's refusing to recognize the bid of the bank's representative above the face amount of the judgment.

We review a trial court's order on a motion to vacate a foreclosure sale for an abuse of discretion. *See Arsali v. Chase Home Fin. LLC*, 121 So. 3d 511, 519 (Fla. 2013). This review applies a reasonableness test: "If reasonable men could differ as

to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion." *Canakaris v. Canakaris*, 382 So. 2d 1197, 1203 (Fla. 1980). "The discretionary ruling of the trial judge should be disturbed only when his decision fails to satisfy this test of reasonableness." *Id.*

Within the abuse of discretion inquiry, we review de novo the trial court's legal determinations and its factual findings for competent, substantial evidence. *See Sosa v. Safeway Premium Fin. Co.*, 73 So. 3d 91, 105 (Fla. 2011). Interpretation of a foreclosure judgment presents a legal question subject to de novo review. *See Asset Recovery, Inc. v. Wells Fargo Bank, N.A.*, 405 So. 3d 397, 399 (Fla. 6th DCA 2023). And where there is competent, substantial evidence to support the trial court's factual findings, we defer to its weight and credibility determinations. *See, e.g.*, *Wheeler v. State*, 124 So. 3d 865, 873 (Fla. 2013) ("As long as the trial court's findings are supported by competent substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court." (internal quotation marks omitted)).

Finally, "[i]n appellate proceedings the decision of a trial court has the presumption of correctness and the burden is on the appellant to demonstrate error." *Applegate v. Barnett Bank of Tallahassee*, 377 So. 2d 1150, 1152 (Fla. 1979). "Even

when based on erroneous reasoning, a conclusion or decision of a trial court will generally be affirmed if the evidence or an alternative theory supports it." *Id.* "Stated another way, if a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which would support the judgment in the record." *Dade Cnty. Sch. Bd. v. Radio Station WQBA*, 731 So. 2d 638, 644 (Fla. 1999).

### III

The trial court's brief order denying the bank's motion to vacate the foreclosure sale is presumed correct, and it is the bank's burden on appeal to demonstrate error. *See Applegate*, 377 So. 2d at 1152. The bank fails to meet this burden under binding Florida Supreme Court precedent requiring a litigant seeking to set aside a foreclosure sale to make a proper showing of an equitable factor resulting in an injustice to the litigant. Below, we explain the proper showing required and how the bank failed to make it.

### A

Foreclosure is an equitable proceeding in which the trial court is the finder of fact. *See* § 702.01, Fla. Stat. ("All mortgages shall be foreclosed in equity. . . . The foreclosure claim shall, if tried, be tried to the court without a jury."). A foreclosure sale challenge is also an equitable proceeding. *See Arsali*, 121 So. 3d at 518 ("[T]he trial courts' use of their equity powers in resolving disputes pertaining to judicial foreclosure sale set aside actions is essential.").

7

In *Arsali*, the Florida Supreme Court explained the trial court's equitable power in foreclosure set-aside proceedings as the power "to ensure that 'equity will act to prevent the wrong result.'" 121 So. 3d at 519 (quoting *Arlt v. Buchanan*, 190 So. 2d 575, 577 (Fla. 1966)). The supreme court also surveyed several of its prior decisions in explaining how a litigant can obtain relief from a foreclosure sale on equitable grounds:

> Our decisions show that we have consistently held that the mere allegation of any single factor or any specific combination of factors is insufficient for litigants to prevail in an action seeking a set aside of a judicial foreclosure sale. Instead our previous decisions have consistently required that litigants allege one or more adequate equitable factors *and make a proper showing to the trial court that they exist* in order to successfully obtain an order that sets aside a judicial foreclosure sale.

121 So. 3d at 518 (emphasis added).

The "one or more adequate equitable factors" from the supreme court's prior decisions include "'gross inadequacy of consideration, surprise, accident, or mistake imposed on complainant, and irregularity in the conduct of the sale.'" *Id.* at 516 (quoting *Moran-Alleen Co. v. Brown*, 123 So. 561, 561 (Fla. 1929)). The court rejected, however, a "presumption among the district courts that a single equitable factor . . . or a specific combination of previously identified factors must be applied by the trial courts in order to set aside judicial foreclosure sales." *Id.* at 517. Thus, the court "reemphasize[d] that 'this court is committed to the doctrine that a judicial

8

sale may on a proper showing made, be vacated and set aside on any or all [equitable] grounds.'" *Id.* at 515 (second modification in original) (quoting *Brown*, 123 So. at 561).

The "proper showing" of an equitable ground reemphasized by *Arsali* necessarily includes a showing of inequity—i.e., a "wrong result" from the foreclosure sale justifying the trial court's exercise of its equitable power to set it aside. *See id.* at 519. Thus, an equitable factor justifying set-aside is only "adequate" and properly shown to "exist," *id.* at 518, if it is shown to have "resulted in injustice being done" to the complaining litigant, *id.* (quoting *Arlt*, 190 So. 2d at 577–78). In other words, the proper showing of an equitable ground for set-aside is a showing of an equitable factor or factors resulting in injustice.

The *Arsali* court validated the injustice requirement in the proper showing analysis from its previous decisions by quoting with approval *Arlt v. Buchanan*, in which the court reversed the Third District and reinstated a trial court order denying a motion to dismiss a complaint to set aside a foreclosure sale. 190 So. 2d at 576. In *Arlt*, a judgment debtor alleged that irregularities in the foreclosure sale of her property entitled her to set aside the sale. *Id.* Her specific allegations included that the sheriff conducted the sale in a place other than the place advertised, the successful bid was $1,000 for property appraised at $102,000, and she was present

at the time and place advertised to satisfy the judgment. *Id.* The trial court denied a motion to dismiss her complaint, and the successful bidder appealed. *Id.*

The Third District reversed the trial court on a ground not advanced by any party. *Id.* In turn, the supreme court reversed the Third District, explaining that setting aside a foreclosure sale requires a showing of some equitable factor or factors *and* a resulting injustice:

> The general rule is, of course, that standing alone mere inadequacy of price is not a ground for setting aside a judicial sale. But where the inadequacy is gross and is shown to result from any mistake, accident, surprise, fraud, misconduct or irregularity upon the part of either the purchaser or other person connected with the sale, *with resulting injustice to the complaining party*, equity will act to prevent the wrong result.
>
> . . . We think the chancellor acted correctly in denying the motions to dismiss thereby giving petitioner the opportunity to prove, if she can, that there were material irregularities in the proceedings incident to the sale *and that they resulted in injustice being done to her* as alleged.

*Id.* at 577–78 (emphasis added) (citations omitted).

When the *Arsali* court described a trial court's equitable power to set aside a foreclosure sale as the power "to prevent the wrong result," it quoted from the above *Arlt* court explanation of the proper showing necessary to invoke that power: "We have long recognized that, when there is a *proper showing*, the trial courts in this state possess sufficient powers to ensure that 'equity will act *to prevent the wrong*

10

*result*' in judicial foreclosure sale disputes." *Arsali*, 121 So. 3d at 519 (emphasis added) (quoting *Arlt*, 190 So. 2d at 577). Preceding this description of a trial court's equitable power, the *Arsali* court also approvingly quoted the *Arlt* holding as explaining the proper showing required:

> In *Arlt* we upheld the correctness of the equity court's judgment to provide the petitioner leave to make a *proper showing* for why a set aside of the execution sale was warranted, stating:
>
>> . . . We think the chancellor acted correctly in denying the motions to dismiss thereby giving petitioner the opportunity to prove, if she can, that there were material irregularities in the proceedings incident to the sale *and that they resulted in injustice being done to her* as alleged.

*Arsali*, 121 So. 3d at 518 (emphasis added) (quoting *Arlt*, 190 So. 2d at 577–78).

Thus, when the *Arsali* court explains that its "previous decisions" have required litigants seeking to avoid a foreclosure sale to "allege one or more adequate equitable factors and make a *proper showing* to the trial court that they exist," 121 So. 3d at 518 (emphasis added), the "proper showing" includes a showing that the alleged equitable factor or factors resulted in injustice. *See also Mitchell v. Mason*, 79 So. 163, 164 (Fla. 1918) ("Inadequacy of price, in connection with other circumstances having a tendency to cause such inadequacy *resulting in injury*, is considered sufficient grounds to set aside the sale, especially if the circumstances result from the mistake of one whose duty it is under the decree to make sale of the property;

11

yet the chancellor has a large discretion which will only be interfered with by the appellate court in a *clear case of injustice*." (emphasis added)).

After reaffirming the injustice requirement from *Arlt*, the *Arsali* court applied it. The trial court in *Arsali* had entered a judgment of foreclosure against two homeowners and in favor of their mortgage lender. *Id.* at 513. Before the foreclosure sale, the borrowers had accepted an offer from the lender to reinstate the mortgage by making a lump sum payment by a certain date and time. *Id.* Although the lender had received the payment in time, the lender's counsel "neglected to arrange for the cancelation of the foreclosure sale with the clerk of court, so the sale took place as scheduled." *Id.* A third party purchased the borrowers' home at the sale. *Id.* The trial court, however, granted the borrowers' motion to vacate the sale on "the equities pertaining to the non-cancelation of the judicial foreclosure sale." *Id.*

The en banc Fourth District affirmed the trial court. *Id.* at 514. Approving the Fourth District's decision, the supreme court held, "The borrowers alleged and proved adequate equitable grounds for the trial court to set aside the judicial foreclosure sale . . . ." *Id.* at 519–20. The court explained the borrowers' proper showing with reference to the *Arlt* injustice requirement:

> The evidence presented to the trial court established that . . . the borrowers executed a written agreement to settle the case before the judicial foreclosure sale took place. Nevertheless, the judicial foreclosure sale occurred and the borrowers' residential property was sold. Pursuant to the borrowers' timely objection, the trial court properly

12

used its equity powers to set aside the sale . . . . Thus, the Fourth District's . . . decision properly affirmed the equitable judgment that prevented *a clear injustice to the parties* who had agreed to settle the case below. . . .

We have long recognized that, when there is a *proper showing*, the trial courts in this state possess sufficient powers to ensure that "equity will act to prevent the wrong result" in judicial foreclosure sale disputes. *Arlt,* 190 So. 2d at 577.

*Arsali*, 121 So. 3d at 519 (emphasis added).

B

To make its proper showing under *Arlt* and *Arsali*, that the equitable ground of irregularity required setting aside the foreclosure sale, the bank was required to prove both the factor of irregularity in the foreclosure sale and that the irregularity resulted in an injustice to the bank. The bank proved neither.

As to the factor of irregularity, the bank is correct that its judgment does not require a pre-sale affidavit to support the inclusion of post-judgment interest in the bank's credit bid at the foreclosure sale. Rather, the judgment provides, "the Clerk *shall* credit [the bank's] bid with the total sum with interest . . . accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full." (emphasis added). *Cf. Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985) ("Once a verdict has liquidated the damages as of a date certain, computation of prejudgment interest is merely a mathematical computation. . . . Thus, it is a purely ministerial duty of the trial judge or clerk of the court to add the appropriate amount

13

of interest to the principal amount . . . ."). The judgment only requires the bank to "certify to the Clerk" (e.g., by filing an affidavit) the bank's "advanc[ing] of any monies" (i.e., costs) pursuant to the judgment. It was within the trial court's equitable authority to set these sale procedures in the judgment. *See* § 45.031, Fla. Stat. (2019) ("In any sale of real or personal property under an order or judgment, the procedures provided in this section and ss. 45.0315-45.035 may be followed *as an alternative to any other sale procedure* if so ordered by the court." (emphasis added)); *Royal Palm Corp. Ctr. Ass'n, Ltd. v. PNC Bank, NA*, 89 So. 3d 923, 927 (Fla. 4th DCA 2012) ("[T]he statute plainly gives a circuit judge discretion to tailor the procedure for a foreclosure sale.").

The bank argued in its motion and at the hearing below that the sale clerk disregarded the language of the judgment and improperly required an affidavit to allow the bank to bid its accrued interest above the face amount of the judgment. But the bank did not prove the sale clerk disregarded the judgment provisions because the bank put on no evidence that its "judgment paperwork" or its representative communicated to the sale clerk that the amount it sought to bid above its judgment comprised only interest and no costs subject to the judgment's certification requirement. The bank's representative testified she gave the judgment paperwork to the sale clerk, and the sale clerk testified she reviewed it, but neither testified to the contents of the paperwork apart from the fact that the bank sought to bid more

than the face amount of the judgment. Without evidence that the bank informed the sale clerk it intended to bid an amount over the judgment comprising only accrued interest, or even what that amount was, the trial court could not determine that the sale clerk improperly required an affidavit to support the bid.[2]

Also, the judgment did not obligate the clerk to credit any amount to the bank—either the principal amount of the judgment or interest or costs—unless the bank was the winning bidder at the sale: "*If [the bank] is the purchaser*, the Clerk shall credit [the bank's] bid with the total sum with interest and costs accruing subsequent to this judgment, or such part of it, as is necessary to pay the bid in full." (*See supra* Part I (emphasis added).)[3] It is undisputed that the bank was not the

_____

[2] The bank's brief cites to its written motion to vacate and its counsel's argument at the motion hearing for the factual proposition that "[t]he bid paperwork reflected [the bank] intended to bid $298,500.00 which included the Judgment amount of $246,488.76 and a portion ($52,011.24 of $71,614.732) of the statutory interest due to [the bank]." But the brief cites no witness testimony or document in evidence to support this proposition, and "attorney argument does not constitute evidence to support a factual finding." *Sch. Dist. of Lee Cnty. v. Bracci*, 365 So. 3d 505, 507 (Fla. 6th DCA 2023).

[3] This judgment provision, requiring the sale clerk to credit the judgment debt to the bank's bid only if the bank was the winning bidder, is consistent with the historical practice of mortgagee credit bidding at foreclosure sales. *See generally Tucker v. Crown Corp.*, 183 So. 740, 745 (Fla. 1938) ("The first mortgagee should be accorded, in the decree, the right to bid at such sale to the amount ascertained to be due on the first mortgage debt, and the same (authorized in the decree) be credited to the amount of such *successful bid* made by such mortgagee . . . if he desires to bid." (emphasis added) (quoting *Becker Roofing Co. v. Wysinger*, 124 So. 858, 863 (1929))).

15

winning bidder at the sale, so the sale clerk was never obligated, under the judgment's provisions, to credit any amount to the bank's bid. The bank argues the sale clerk prevented it from bidding at the sale, but the sale clerk testified she opened the sale to all bidders and did not prevent the bank's representative from bidding on the same terms as other bidders. Thus, the trial court's finding that the sale clerk did not prevent the bank's representative from bidding is supported by competent, substantial evidence despite conflicting testimony by the bank's representative. It was within the province of the trial court, as finder of fact, to weigh the credibility of the parties' witnesses and credit the sale clerk's testimony over the bank representative's.[4] *See Southwin, Inc. v. Verde*, 806 So. 2d 586, 588 (Fla. 3d DCA

---

[4] The clerk specifically testified:

> I did inform, not advise, [the bank's representative] that an affidavit or motion needs to be filed to increase the bid amount.
>
> And I never did tell them or bar them from bidding more or less. I opened the bidding to the bidders and the [the bank] equally and according to per statute.
>
> Like I said, I'm not in position to advise; but it is Florida statute that the Plaintiff does have the judgment amount as credit; and if they bid over, they can pay the five percent just like any bidder.

It was within the province of the trial court, as trier of fact, to infer from this testimony that the sale clerk refused to accept a *pre-sale* bid by the bank over its judgment amount but did not refuse to accept an *in-sale* bid by the bank in any amount on the same terms as other bidders. *See Parsons v. Reyes*, 238 So. 2d 561,

2002) ("Determinations regarding the weight of the evidence or the credibility of witnesses are peculiarly within the province of the finder of fact and will not be disturbed on appeal." (quoting *M.A.B. v. Dep't of HRS*, 630 So. 2d 1252, 1254 (Fla. 1st DCA 1994))). It was not until the bank was the winning bidder at the sale that the Clerk would have had any obligation to credit the bank's bid with the total sum of the judgment with interest.

Even if the bank had proved the sale clerk's affidavit requirement and bid procedures were sufficiently irregular to be considered equitable factors in the proper showing analysis, the bank did not prove the irregularity resulted in injustice as required by *Arlt* and *Alsari*. Unlike the borrower-homeowners in *Alsari*, who proved their lender's mistake caused them to lose their home despite having paid the lender what it asked for, and unlike the judgment debtor in *Arlt*, who proffered evidence that she lost her own property for grossly inadequate consideration due to irregularities in the sheriff's conduct of the foreclosure sale, the bank here did not prove it suffered any injustice as a result of the clerk's conduct of the sale. To be sure, these *Arlt* and *Alsari* examples of injustice warranting set-aside are not exhaustive. We need not, and do not, decide all the types or measures of injustice

563 (Fla. 1970) (reserving to finder of fact "weigh[ing] evidence or determin[ing] questions of credibility and . . . the possibility of different conclusions or inferences from the evidence").

that may warrant set-aside; we only decide that the bank offered no evidence of any type or measure whatsoever. For example, the bank did not offer any evidence that it could have sold the property for more than Henry paid had the bank been the winning bidder, that the value of the property was more than Henry paid, or that the bank otherwise suffered a financial loss of any kind as a result of the claimed clerk's error. Nor did the bank offer evidence of any injury to a nonfinancial interest in the property. There is no evidence, for example, that the bank had any interest in acquiring or using the property based on its unique attributes, or that the bank considered the property anything other than collateral to be sold.[5] The bank offered

---

[5] In the context of contracts for conveyance, the uniqueness of real estate generally justifies the equitable remedy of specific performance for breach, but the remedy is not a matter of right—awarding specific performance remains within the discretion of the trial court, and the remedy can be defeated by other equitable considerations. *See generally Edmons v. Gracy*, 54 So. 899, 900 (Fla. 1911) ("Courts of equity may enforce the specific performance of contracts for the conveyance of real estate, owing to the nature and uses of such property, . . . when the application of principles of law to the facts and circumstances of particular cases warrant it."); *Nobles v. L'Engle*, 55 So. 839, 840 (Fla. 1911) ("The specific performance of a contract for the sale of land is not a matter of right, but rests in the sound reasonable discretion of a court of equity."); *Le Noir v. McDaniel*, 86 So. 435, 438 (Fla. 1920) ("The exercise of equity jurisdiction for the specific performance of contracts for the purchase of property does not proceed upon any distinction between real estate and personal estate, but depends on the question whether damages at law may not in the particular case afford a complete remedy."); *Martin v. Albee*, 113 So. 415, 416 (Fla. 1927) ("If the contract is definite as to terms and description of land, is mutual, supported by a consideration, and the vendee may not be amply compensated by damages at law for breach . . . he should not be denied [specific performance] if he has complied with the requirements on his part to be performed."); *Coates v. Hale*, 429 So. 2d 761, 762–63 (Fla. 1st DCA 1983) ("Furthermore, since this case involves the sale of realty, which is unique, we conclude that money damages would be an

18

no evidence of harm or injury of any kind. Therefore, even if irregularity in the sale kept the bank from winning the auction, the bank did not prove any injustice resulting from Henry's purchase. Just as "mere inadequacy of price is not a ground for setting aside a judicial sale," *Arlt*, 190 So. 2d at 577, mere irregularity in the sale, without resulting injustice, is not enough.[6]

---

inadequate remedy to Hale for breach of the land sales contract. Equity ought to require doing that which should have been done . . . ."); *Hembree v. Bradley*, 528 So. 2d 116, 117–18 (Fla. 1st DCA 1988) ("Furthermore, specific performance of a contract for sale of land will be decreed only if the contract is capable of being mutually enforced with results that are just and practical, the moving party is not guilty of laches and there is no countervailing equity against him, and there is no adequate remedy at law available to him."); *Bermont Lakes, LLC v. Rooney*, 980 So. 2d 580, 586 (Fla. 2d DCA 2008) ("[M]oney damages are considered an inadequate remedy at law to a purchaser of land because all land is considered unique."); *DiMauro v. Martin*, 359 So. 3d 3, 9 (Fla. 4th DCA 2023) ("While land is considered unique and the court may grant specific performance in cases dealing with land-sale contracts, the trial court has discretion to decide whether to grant or deny specific performance when not expressly provided for in the contract."); *but see Henry v. Ecker*, 415 So. 2d 137, 140 (Fla. 5th DCA 1982) ("Since all land is considered unique, money damages to a contract purchaser of lands is an inadequate remedy at law. Therefore, specific performance of contracts for the sale and purchase of real property is generally granted as a matter of right where their terms are fair, certain and definite and they have been entered into without misunderstanding or misrepresentation."), *rev. denied*, 429 So. 2d 5 (Fla. 1983).

[6] We affirm for both the bank's lack of proof of irregularity and its lack of proof of injustice. Though we could affirm on either point without deciding the other, both justifications are holding. *See Parsons v. Fed. Realty Corp.*, 143 So. 912, 920 (Fla. 1931) ("Two or more questions properly arising in a case under the pleadings and proof may be determined, even though either one would dispose of the entire case upon its merits, and neither holding is a dictum, so long as it is properly raised, considered, and determined."); *see also Crecelius v. Rizzitano*, 430 So. 3d 268, 286 (Fla. 6th DCA 2026) (Gannam, J., concurring) ("Post-*Pedroza* [*v.*

# IV

The bank did not make a proper showing of an equitable ground justifying set-aside of the foreclosure sale because the bank did not prove irregularity in the foreclosure sale or any other equitable factor resulting in an injustice to the bank. Thus, the trial court did not abuse its discretion in overruling the bank's objection and denying its motion to vacate the foreclosure sale.

AFFIRMED.

NARDELLA, BROWNLEE and KAMOUTSAS, JJ., concur.
MIZE, J., concurs, with opinion.
PRATT, J., concurs, with opinion.
WOZNIAK, J., dissents, with opinion, in which TRAVER, C.J., and STARGEL, WHITE and SMITH, JJ., concur.
SMITH, J., dissents, with opinion.

---

NOT FINAL UNTIL TIME EXPIRES TO FILE MOTION FOR REHEARING
AND DISPOSITION THEREOF IF TIMELY FILED

---

MIZE, J., concurring.

I fully concur in the en banc majority opinion. Since five of my colleagues voted against hearing this case en banc, I find it appropriate to write separately to

---

*State*, 291 So. 3d 541 (Fla. 2020)], necessity is no longer viable as a shorthand test for propositions that count as holding.").

share my opinion on the proper framework for deciding whether to hear or rehear a case en banc.

Florida Rule of Appellate Procedure 9.331(a) permits a district court to hear or rehear a case en banc if the case or an issue therein is of "exceptional importance" or if it is "necessary to maintain uniformity in the court's decisions." While the Florida Supreme Court has limited en banc hearing and rehearing to cases that meet at least one of these standards, the Court also imbued district courts with broad discretion to develop their own interpretations and concepts as to each of these standards. *See Chase Fed. Sav. & Loan Ass'n v. Schreiber*, 479 So. 2d 90, 94 (Fla. 1985) ("We expressly granted the district courts broad discretionary authority to develop their own concept of decisional uniformity to be able to fully carry out these expressed purposes." (internal quotation omitted)); *Childers v. State*, 936 So. 2d 619, 632 (Fla. 1st DCA 2006) (Padovano, J., concurring) ("[*Chase*] held that the district courts are free to develop their own standard of decisional uniformity in deciding whether to grant *en banc* hearings and rehearings. It is logical to assume that the supreme court holds the same view about the proper interpretation and application of the term 'exceptional importance.' This part of the rule was added after the decision in *Chase,* but the general point is the same. The supreme court recognized that *en banc* review is a matter for the district courts."). The subjective standards chosen by the Florida Supreme Court to determine whether cases may be heard en

banc and the broad discretion the Supreme Court bestowed upon district courts to develop and interpret those standards, along with the constitutional structure of a district court in which panels exercise power on behalf of the court as an institution, indicates to me that the en banc rule provides district courts with substantial discretion to exercise administrative control and supervision over the work of panels that exercise power on behalf of the court. *See Normandy Ins. Co. v. Bouayad*, 372 So. 3d 671, 700-01 (Fla. 1st DCA 2023) (Tanenbaum, J., concurring in denial of rehearing en banc) (discussing structure of the district courts acting as an institution through three-judge panels and en banc hearing as a mechanism giving district courts broad discretion to exercise administrative control and supervision over the work of panels). It follows that each district judge exercises broad discretion to determine which cases or issues are of "exceptional importance" and when en banc hearing or rehearing is "necessary to maintain uniformity in the court's decisions."

As it pertains to exercising the discretion vested in district judges to determine whether a case or issue therein is exceptionally important, I would submit that a determination of whether a case or issue is of exceptional importance must necessarily be a case-specific and individualized determination that may properly involve consideration of factors so myriad that listing them all would not be possible. A district judge considering a request to hear a case en banc may consider: (1) The extent to which a panel opinion, or the en banc opinion which will replace the panel

opinion, sets forth a new legal standard, or the extent to which either of those opinions will alter or affect future application of an existing standard; (2) How many future parties and cases will the case affect?; (3) How significant will the effect be on future cases and parties?; (4) Is there a conflict with other district courts?; (5) Will the Florida Supreme Court be able to review the case?; (6) Does the case put Florida law out of step with other states or the federal courts?; (7) Do the issues in the case affect constitutional rights?; (8) Will the issues in the case have a major impact on the Florida economy?; (9) Will the case create or avoid logistical problems for the Florida court system or other parts of the Florida government or local governments?; and (10) Will the outcome of the case directly or indirectly affect persons or entities that are not parties to the case or the state as a whole?

There may also be significant jurisprudential considerations that are difficult to precisely quantify. For example, what portion of the recent legal authority on an issue will the case make up? Even if there is a clear standard set forth in a Florida Supreme Court opinion, a new opinion from a district court applying that standard may take up essentially all of the jurisprudential oxygen on the issue if there are few or no other recent district court opinions on the issue. Indeed, the first district court opinion applying a standard previously set forth by the Florida Supreme Court would bind all trial courts in the state as to how to apply the Florida Supreme Court's

standard. *Pardo v. State*, 596 So. 2d 665, 666 (Fla. 1992) ("[I]n the absence of interdistrict conflict, district court decisions bind all Florida trial courts.").

Lastly, there may be matters specific to the parties or the case that are of exceptional importance. If a case involves whether to end a human being's life, I think a district judge may properly consider that in determining whether a case is of exceptional importance, even if the case will have no impact on other cases or anyone except the parties to that case. Likewise, if a case will determine the outcome of a statewide or nationwide election, and therefore the trajectory of our state or nation, I think a district judge may determine that such a case is exceptionally important even if it will have little or no impact on the broader development of jurisprudence in Florida. In some instances, the subject matter of the case alone may be sufficient to satisfy the standard of exceptional importance.

The factors and examples I list above are not exhaustive. It would be impossible to list every factor a judge might consider in determining whether a case is exceptionally important because no judge could predict the infinite legal, procedural and factual postures in which cases reach us. In essence, it is a judgment call. Every judge that considers whether to hear a case en banc must assess all aspects of the case and its effect on the parties, our jurisprudence and the state and make an individualized determination as to whether the case warrants hearing en banc. *See Normandy Ins.*, 372 So. 3d at 702 (Tanenbaum, J., concurring in denial of

rehearing en banc) ("Each voting judge in this matter has made an individualized determination as a constitutional officer—each tasked with applying his or her own independent, reasoned judgment as a member of the court."). As then-Judge Tanenbaum stated, "[t]hat determination absolutely is discretionary and is not subject to any outside review." *Id*.

As to this case specifically, the en banc majority opinion is the first opinion from any district court discussing in detail *Arsali*'s injustice requirement. That alone makes the case exceptional, as it will bind all trial courts in the state as to how to apply the injustice requirement. *See Pardo*, 596 So. 2d at 666. This issue will affect every one of the thousands of foreclosure sales conducted every year across Florida, with obvious effects on our trial courts, the banking industry and the real estate industry. However, to the extent the face of the majority opinion in this case or any other case heard en banc leaves any doubt as to the case's importance, I would note that whether a case heard en banc or an issue therein met the exceptional importance standard cannot be accurately evaluated without consideration of the difference between the en banc majority opinion and the panel opinion that would have issued if the case had not been heard en banc. Even if the en banc majority opinion does not, on its face, make it clear why the exceptional importance standard was satisfied, it might nonetheless be the case that an incorrect panel opinion, and any

jurisprudential harm that the opinion would have inflicted on our state, caused the case to meet the standard.

---

PRATT, J., concurring.

Procedurally, I voted to determine this case en banc because I believe it to present an issue of exceptional importance. *See* Fla. R. App. P. 9.331(a) ("A majority of the participating judges of a district court of appeal may order that a proceeding pending before the court be determined en banc. . . . En banc hearings and rehearings shall not be ordered unless the case or issue is of exceptional importance or unless necessary to maintain uniformity in the court's decisions."). Substantively, I fully concur in the majority's en banc decision. I write separately to explain that Florida Rule of Appellate Procedure 9.331—the en banc rule duly promulgated by the Florida Supreme Court pursuant to its constitutional administrative authority under article V, section 2(a), Florida Constitution—is constitutional and does not violate article V, section 4(a), Florida Constitution, pursuant to binding Florida Supreme Court precedent; that the Florida Supreme Court is unlikely to recede from its precedent affirming the constitutionality of the en banc rule in light of its current stare decisis test because there is a reasonable explanation that validates the constitutionality of the en banc rule; that district courts of appeal have broad discretionary authority to interpret and apply the "case or issue is of exceptional

26

importance" component of the en banc rule on a case-by-case and issue-by-issue basis; and that the Sixth District Court of Appeal is uniquely positioned as a newly created district court of appeal to explore the meaning of "the case or issue is of exceptional importance" component of the en banc rule and, where appropriate, to exercise its broad discretion to invoke it.

At one time or another, some district court judges have expressed their concerns regarding the constitutionality of the en banc rule in light of article V, section 4(a)'s language that "[t]hree judges shall consider each case and the concurrence of two shall be necessary to a decision." *See generally, e.g.*, *Williams v. State*, 421 So. 3d 809, 844-48 (Fla. 2d DCA 2025) (Moe, J., concurring in part and dissenting in part); *Bates v. Bates*, 345 So. 3d 328, 345 (Fla. 3d DCA 2021) (Logue, J., concurring in denial of rehearing en banc); *State v. Petagine*, 290 So. 3d 1106, 1108-1113 (Fla. 1st DCA 2020) (Tanenbaum, J., concurring in the denial of rehearing en banc);[7] *Shrader v. State*, 278 So. 3d 270, 292 & n.18 (Fla. 2d DCA 2019) (Northcutt, J., dissenting); *Childers v. State*, 936 So. 2d 585, 610-11 (Fla. 1st DCA 2006) (Ervin, J., concurring and dissenting); *McDowell v. Rodriguez*, 822 So. 2d 14, 17 (Fla. 5th DCA 2002) (Pleus, J., dissenting); *State v. Georgoudiou*, 560 So.

---

[7] As noted later in this opinion, then-Judge Tanenbaum subsequently changed his view and made a strong case for the constitutionality of the en banc rule. *See generally Normandy Ins. Co. v. Bouayad*, 372 So. 3d 671, 699-702 & n.6 (Fla. 1st DCA 2023) (Tanenbaum, J., concurring in the denial of rehearing en banc).

2d 1241, 1247 (Fla. 5th DCA 1990) (Cowart, J., dissenting); *Carroll v. State*, 497 So. 2d 253, 263 (Fla. 3d DCA 1985) (Hubbart, J., dissenting). Although I do not share in their concerns, I commend them for expressing them. However, as district court judges, we do not write on a clean slate regarding the en banc rule. Vertical stare decisis requires this Court to accept the constitutional validity of the en banc rule as established by binding Florida Supreme Court precedent—namely, the Florida Supreme Court's decision in *Chase Federal Savings and Loan Association v. Schreiber*, 479 So. 2d 90 (Fla. 1985). *Id.* at 93 ("This Court has held the en banc process to be constitutional . . . . In holding the en banc process constitutional, we construed the 'three judges shall consider each case' language of article V, section 4, as not restricting the district courts from hearing cases en banc." (citing *In re Rule 9.331, Determination of Causes by a Dist. Ct. of Appeal En Banc, Fla. R. App. P.*, 374 So. 2d 992, 994 (Fla. 1979), *as modified in* 377 So. 2d 700 (Fla. 1979), *and as further modified in* 416 So. 2d 1127 (Fla. 1982)); *see also id.* at 94 ("We hold that the district court of appeal, in implementing the provisions of appellate procedure rule 9.331, has authority to adopt the standard of conflict it believes necessary or appropriate in order to harmonize the decisions of the court and avoid costly

relitigation of similar issues within its appellate district.").[8],[9] The Florida

Constitution carefully delineates the structural hierarchy of Florida's courts, with the

Florida Supreme Court sitting at the very top of the state judiciary. *See generally* art.

V, §§ 1-6, Fla. Const. (structurally delineating between Florida's courts, including

its supreme court, district courts of appeal, circuit courts, and county courts). The

Florida Supreme Court is "supreme" in both name and function—meaning that it

maintains the place of highest rank or authority in our state's judiciary in all matters

within the proper scope of its authority. Practically speaking, this means that inferior

courts like Florida's district courts of appeal must follow the binding precedents of

the Florida Supreme Court, and inferior courts like Florida's circuit and county

---

[8] At the inception of the en banc rule, former Justice Boyd expressed his concerns regarding the constitutionality of the en banc rule. *See generally In re Rule 9.331, Determination of Causes by a Dist. Ct. of Appeal En Banc, Fla. R. App. P.*, 374 So. 2d 992, 994-95 (Fla. 1979) (Boyd, J., dissenting). But former Justice Boyd later accepted the constitutional validity of the en banc rule in his majority opinion in *Chase*.

[9] When I refer to precedent, I refer to holdings as opposed to dicta of decisional authorities. *See Crecelius v. Rizzitano*, 430 So. 3d 268, 274 (Fla. 6th DCA 2026) ("While we are bound to follow all holdings of the Florida Supreme Court, we are not bound by dicta contained in the Supreme Court's opinions."). *See generally Pedroza v. State*, 291 So. 3d 541, 547 (Fla. 2020) (holding among other things that "[a]ny statement of law in a judicial opinion that is not a holding is dictum" and "[a] holding consists of those propositions along the chosen decisional path or paths of reasoning that (1) are actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment" (first citing to and then quoting from *State v. Yule*, 905 So. 2d 251, 259 n.10 (Fla. 2d DCA 2005) (Canady, J., specially concurring) (quoting Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 1065 (2005)))).

courts must follow the binding precedents of the district courts of appeal, as applicable, in the absence of binding precedent from the Florida Supreme Court. *See, e.g.*, *Pardo v. State*, 596 So. 2d 665, 666-67 (Fla. 1992) ("The District Courts of Appeal are required to follow Supreme Court decisions. As an adjunct to this rule it is logical and necessary in order to preserve stability and predictability in the law that, likewise, trial courts be required to follow the holdings of higher courts— District Courts of Appeal. The proper hierarchy of decisional holdings would demand that in the event the only case on point on a district level is from a district other than the one in which the trial court is located, the trial court be required to follow that decision. Alternatively, if the district court of the district in which the trial court is located has decided the issue, the trial court is bound to follow it. Contrarily, as between District Courts of Appeal, a sister district's opinion is merely persuasive." (citation omitted)). Indeed, we as an inferior district court of appeal are duty-bound to faithfully follow and apply the precedents of our superior, the Florida Supreme Court. *See, e.g.*, *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, 415 So. 3d 180, 192 (Fla. 2025) ("The district courts' duty to follow our precedents stems from the hierarchical structure established in our constitution and from this Court's express authority to review certain district court decisions, including those that conflict with our decisions or that expressly construe constitutional provisions. Art. V, § 3(b)(3), Fla. Const. The authority of our decisions

30

does not depend on the procedural posture of the cases in which they are issued. Indeed, as a practical justification for demanding lower courts' adherence to our decisions, our Court has emphasized fairness to litigants and the benefits of regularity and predictability in lower court litigation. . . . Even when a district court disagrees with a decision of this Court, it is the lower court's duty to follow our precedent." (citations omitted)).[10] The upshot is that we are not free to disregard the Florida Supreme Court's binding validation of the constitutionality of the en banc rule in *Chase*. We must therefore apply the en banc rule as a constitutional given.

The Florida Supreme Court also does not write on a clean slate regarding the en banc rule. As indicated previously, the Florida Supreme Court has issued several

---

[10] A limited exception exists where a United States Supreme Court precedent abrogates or otherwise displaces a Florida Supreme Court precedent regarding a matter of federal constitutional or statutory law. In such a circumstance, a district court of appeal must faithfully apply the United States Supreme Court precedent. *See Spencer v. State*, 389 So. 2d 652, 653 (Fla. 1st DCA 1980) ("The decisions of the United States Supreme Court on questions of federal constitutional [and federal statutory] law have direct and controlling effect on our decisions though the Florida Supreme Court has not yet had an opportunity to conform its previously expressed views, which were themselves in conformity with United States Supreme Court decisions as then understood by the Florida Supreme Court."); *see also McDaniels v. State*, 419 So. 3d 1180, 1188 (Fla. 1st DCA 2025) ("While decisions of our state supreme court ordinarily bind this court, the United States Supreme Court's interpretation of the federal Constitution is 'the supreme Law of the Land,' and we are bound to follow it."). *See generally* U.S. Const. art. VI, cl. 2 ("This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.").

decisions validating the constitutionality of the en banc rule, including *Chase*, a decision rendered by the Florida Supreme Court in the adjudicative as opposed to the rulemaking context. Although those decisions are not technically binding on the Florida Supreme Court, the Florida Supreme Court generally follows its own prior decisions as horizontal stare decisis for prudential reasons, including maintaining stability in the law. *See, e.g.*, *State v. Poole*, 297 So. 3d 487, 506 (Fla. 2020) ("Stare decisis provides stability to the law and to the society governed by that law." (citation omitted)). And I respectfully submit that, if the Florida Supreme Court were inclined to reconsider the constitutionality of the en banc rule, as some district court judges have called for, the Florida Supreme Court would be likely to validate rather than invalidate the en banc rule in a given case because *Chase*'s interpretation of the en banc rule is not clearly erroneous pursuant to the Florida Supreme Court's current stare decisis test. *See generally id.* at 506-07 ("It is no small matter for one Court to conclude that a predecessor Court has clearly erred. The later Court must approach precedent presuming that the earlier Court faithfully and competently carried out its duty. A conclusion that the earlier Court erred must be based on a searching inquiry, conducted with minds open to the possibility of reasonable differences of opinion. . . . We believe that the proper approach to stare decisis is . . . straightforward. In a case where we are bound by a higher legal authority—whether it be a constitutional provision, a statute, or a decision of the Supreme Court—our job is to apply that law

correctly to the case before us. When we are convinced that a precedent clearly conflicts with the law we are sworn to uphold, precedent normally must yield. We say normally because stare decisis means sticking to some wrong decisions. Indeed, stare decisis has consequence only to the extent it sustains incorrect decisions; correct judgments have no need for that principle to prop them up. But once we have chosen to reassess a precedent and have come to the conclusion that it is clearly erroneous, the proper question becomes whether there is a valid reason *why not* to recede from that precedent." (citations and internal quotation marks omitted)). As then-Judge Tanenbaum has explained, there is a legitimate interpretation of article V of the Florida Constitution that validates the constitutionality of the en banc rule. *See generally Normandy Ins. Co. v. Bouayad*, 372 So. 3d 671, 699-702 & n.6 (Fla. 1st DCA 2023) (Tanenbaum, J., concurring in the denial of rehearing en banc). Because I cannot state it better, I quote then-Judge Tanenbaum extensively below:

> The decision to consider—or reconsider—a matter en banc necessarily is a discretionary one. This court's ability to "go en banc," at best, is only a procedural mechanism, adopted by rule under the supreme court's administrative authority. *See In re Fla. Rules of App. Proc.*, 374 So. 2d at 993 ("The purpose of the proposed recommendation is to provide a formal *procedural mechanism* to permit the district courts to settle conflicts of decisions arising within the same district and to speak with one voice as a court on matters of exceptional importance." (emphasis supplied) (quoting report of Appellate Structure Commission regarding proposed en-banc rule)); *cf.* Art. V, § 2, Fla. Const. ("The supreme court shall adopt rules for the *practice and procedure* in all courts including . . . the *administrative* supervision of all courts . . . ." (emphasis supplied)).[6]

33

[6 Yes, early on in my judicial career, I questioned the constitutionality of the whole en-banc regime . . . . *See State v. Petagine*, 290 So. 3d 1106, 1108 (Fla. 1st DCA 2020) (Tanenbaum, J., concurring) ("Believe it or not, we as a full court cannot override a panel decision simply because a majority of us disagree with it. I vote to deny the appellee's request for rehearing en banc because both the Florida Constitution and the applicable appellate rule tell me that we have no authority to grant it."). This administrative tool no doubt is here to stay, its constitutionality being accepted by the supreme court. *Cf. Chase*, 479 So. 2d at 93 (claiming to have recognized the constitutionality of the en-banc process, albeit in a non-adjudicatory, administrative proceeding). Experience also has led me to a deeper understanding of the judicial power vested by our constitution. As an alternative to my analysis in *Petagine*, then, here I try (briefly) to make heads-or-tails of the rule—as adopted by the supreme court—within our constitutional structure, but starting with the premise that the process is valid.]

The Florida Constitution vests the district courts of appeal with the State's judicial power of appellate review. *See* Art. V, § 1, Fla. Const. ("The judicial power shall be vested in a supreme court, district courts of appeal, circuit courts and county courts."); Art. V, § 4(b)(1)–(2), Fla. Const. (granting district courts the jurisdiction to "hear appeals . . . from final judgments or orders of trial courts" and "the power of direct review of administrative action, as prescribed by general law"); *cf. Bush v. Schiavo*, 885 So. 2d 321, 330-31 (Fla. 2004) (explaining how "purely judicial acts" are not subject to review under the exercise of any sovereign power but judicial power); *Marbury v. Madison*, 5 U.S. 137, 175 (1803) ("It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause already instituted, and does not create that cause."). The supreme court's approach in adopting the current en-banc process—essentially, placing it under the administrative control of a majority vote of the district court's "participating" judges regarding a particular case—seemingly makes a critical presumption about a district court's exercise of this vested power.

For the process to make constitutional sense, it must be—in the view of the supreme court—that the judicial power *always remains vested* in the district court as an institution, but with the allowance that

34

the district court *may exercise* that authority in an individual appeal through a majority vote of one of its three-judge panels. *See* Art. V, § 4(a), Fla. Const. ("Three judges shall consider each case and the concurrence of two shall be necessary to a decision."); *cf. Chase*, 479 So. 2d at 93 ("In holding the en banc process constitutional, we construed the 'three judges shall consider each case' language of article V, section 4, as not restricting the district courts from hearing cases en banc."); Fla. R. Gen. Prac. & Jud. Admin. 2.210(a)(1) (providing for the "Exercise of Powers and Jurisdiction" through three-judge panels).

In the typical appeal (administratively assigned to a panel of three of a district court's judges), a majority vote of two of the judges on the panel will be a sufficient basis for the clerk to issue a mandate. That is the court's judgment disposing of the appeal and is the manifestation of the district court's exercise of its judicial power operating on the trial court's judgment. Put another way: While the constitution allows for panels to dispose of appeals filed with the district court—on its behalf and exercising the judicial power vested in the court—*according to the supreme court*, that power always remains in the possession of the whole court and under the administrative control of a majority of the court's complement of participating judges. *See Chase*, 479 So. 2d at 93 (noting the Supreme Court's holding "that the en banc process was an expression of the [circuit] court's power rather than a party's right").

As it turns out, under the supreme court's rules, district-court panels (and even the individual judges) are subject to a myriad of administrative controls. For instance, the constituting of panels of judges of this court and the assignment of appeals to those panels for disposition are administratively directed by the court's conference of judges and their chief. *See* Fla. R. Gen. Prac. & Jud. Admin. 2.210(a)(2) (providing for internal governance through a chief judge, whose "administrative powers and duties" include the assignment of cases and judges and control of the docket); *cf.* First Dist. Ct. of Appeal I.O.P. 4.3 (providing for court conferences "to consider administrative matters and the adoption of policies"); *id.* 5.1, 5.1.3 (addressing the constituting of "merits panels" and assignment of appeals thereto). How a panel considers and decides a case, and how it issues its opinion and disposition, are procedurally directed by court rule. *See, e.g., id.* 5.1.3, 5.4.

35

If these premises are true, then it is not a huge leap to say that, under rule 9.331, the district court's judges, as a conference, *also* retain the discretionary authority to recall the administrative assignment of an appeal from one of its three-judge panels and retain the appeal for disposition by the whole court. Similarly, by rule, the district court's internal conference of judges also has at its disposal the ultimate procedural apparatus to maintain control over how the institution's judicial power is exercised by a panel: proscribing the clerk's issuance of the court's final judgment in an appeal. *See* Fla. R. Gen. Prac. & Jud. Admin. 2.210(1), (4) (providing that the clerk of court "shall hold office at the pleasure of the court[,] perform such duties as the court directs," and "issue such mandates or process as may be directed by the court"); First Dist. Ct. of Appeal I.O.P. 5.7 (requiring issuance of a mandate "[u]nless otherwise directed by the Court").

The supreme court, by adopting the en-banc rule, in essence has recognized (at least, in its administrative capacity) that the judicial work of each panel of three district judges remains under the aegis (and thereby supervision) of the district court's full complement of participating judges—that is, the whole court *qua* a singular judicial institution vested with sovereign constitutional power as to the lower courts within its territorial reach. *Cf. Chase*, 479 So. 2d at 94 ("The en banc process provides a means for Florida's district courts to avoid the perception that each court consists of independent panels speaking with multiple voices *with no apparent responsibility to the court as a whole.* The process provides an important forum for each court to work as a unified collegial body to achieve the objectives of both finality and uniformity of the law within each court's jurisdiction." (emphasis supplied)). The supreme court, in turn, gives each district court broad discretion on how to exercise this supervision. *Cf. id.* ("We expressly granted the district courts broad discretionary authority to develop their own concept of decisional uniformity to be able to fully carry out these expressed purposes." (internal quotation omitted)).

*Id.* at 699-702 & n.6 (Tanenbaum, J., concurring in the denial of rehearing en banc).

Then-Judge Tanenbaum made a strong case for the constitutionality of the en banc rule. Even if one might reasonably disagree, at a minimum, there is a reasonable

36

explanation for the en banc rule that validates its constitutionality. For that reason, the Florida Supreme Court is unlikely to recede from *Chase* as a precedent pursuant to the Florida Supreme Court's current stare decisis test.[11],[12]

---

[11] Another reasonable explanation for the en banc rule that supplementally validates its constitutionality is that article V, section 4(a) "sets only a minimum standard and does not prohibit en banc review by district courts of appeal." *In re Rule 9.331, Determination of Causes by a Dist. Ct. of Appeal En Banc, Fla. R. App. P.*, 374 So. 2d 992, 993 (Fla. 1979) (quoting from report of the Florida Appellate Structure Commission regarding the justification for the en banc rule). Under that view, the text of article V, section (4)(a) does not restrict district courts of appeal from hearing cases en banc because the text does not state, for example, that *only* three judges shall consider each case, or that the number of concurring judges necessary to a decision is *limited* to just two judges (as even on a three-judge district court panel all three judges may concur in a decision). As such, the text of article V, section (4)(a) holds the capacity to allow for—and does allow for—en banc review by district courts of appeal pursuant to the en banc rule duly promulgated by the Florida Supreme Court pursuant to its constitutional administrative authority under article V, section 2(a).

[12] *Poole*'s two-step approach to stare decisis analysis—i.e., (1) initially focusing on whether a precedent is "clearly erroneous" and, if so, (2) defaulting to receding from the precedent unless there is "a valid reason *why not* to recede from that precedent"—is a marked improvement upon prior iterations of the Florida Supreme Court's stare decisis test that were non-objective, malleable, inconsistent, unpredictable, and policy-driven. *Poole*, 297 So. 3d at 507. *See generally id.* ("More fundamentally, we are wary of any invocation of multi-factor stare decisis tests or frameworks like the one set out in [*North Florida Women's Health & Counseling Services, Inc. v. State*, 866 So. 2d 612 (Fla. 2003)]. They are malleable and do not lend themselves to objective, consistent, and predictable application. They can distract us from the merits of a legal question and encourage us to think more like a legislature than a court. And they can lead us to decide cases on the basis of guesses about the consequences of our decisions, which in turn can make those decisions less principled. Multi-factor tests or frameworks like the one in *North Florida Women's Health* often serve as little more than a toolbox of excuses to justify a court's unwillingness to examine a precedent's correctness on the merits."). Perhaps the *Poole* stare decisis test should be simplified such that, if the Florida Supreme

Because I voted to determine this case en banc, I find it fitting to briefly discuss my early views of "the case or issue is of exceptional importance" component of the en banc rule. The en banc rule is a rule that the Florida Supreme Court has deemed appropriate to promulgate pursuant to its discretionary authority under article V, section (2)(a). *See* art. V, § (2)(a), Fla. Const. ("The supreme court

---

Court or a Florida district court of appeal determines that its own horizontal stare decisis precedent is clearly erroneous, the court should recede from its precedent full stop. Conceptually, this sort of approach shows the greatest fidelity to the highest substantive law applicable to a given case without subordinating the law—be it a constitution, statute, or other legal authority—to the non-objective, policy-laden question of whether there is a "valid reason" not to recede from the precedent that clearly conflicts with the law. *Compare, e.g.*, *Poole*, 297 So. 3d at 507 ("[O]nce we have chosen to reassess a precedent and have come to the conclusion that it is clearly erroneous, the proper question becomes whether there is a valid reason *why not* to recede from that precedent."), *with, e.g.*, *Gamble v. United States*, 587 U.S. 678, 718-19 (2019) (Thomas, J., concurring) ("When faced with a demonstrably erroneous precedent, my rule is simple: We should not follow it. This view of stare decisis follows directly from the Constitution's supremacy over other sources of law—including our own precedents. . . . [B]ecause the Constitution is supreme over other sources of law, it requires us to privilege its text over our own precedents when the two are in conflict. I am aware of no legitimate reason why a court may privilege a demonstrably erroneous interpretation of the Constitution over the Constitution itself. The same principle applies when interpreting statutes and other sources of law: If a prior decision demonstrably erred in interpreting such a law, . . . judges should exercise the judicial power—not perpetuate a usurpation of the legislative power—and correct the error. A contrary rule would permit judges to substitute their own pleasure for the law." (citations, footnotes, and internal quotation marks omitted)). But since *Poole* is the Florida Supreme Court's precedent and not our own, it is for the Florida Supreme Court to determine whether it should simplify its stare decisis test in a future case, either at the invitation of the parties before it or of the Florida Supreme Court's own accord, to remove the last remaining vestiges of the tattered, ramshackle, stare-decisis construct of the bygone era embodied by *North Florida Women's Health*.

shall adopt rules for the practice and procedure in all courts including . . . the administrative supervision of all courts . . . ."). On its face, the en banc rule does not delineate the outer contours of the "case or issue is of exceptional importance" component of the en banc rule. In my view, that formulation has worked well and should not be changed. There is no indication that the district courts of appeal are confused by the meaning of the "case or issue is of exceptional importance" component of the en banc rule. The language of the rule itself provides ample guidance. And that guidance is buttressed by the 1982 committee notes commentary to the en banc rule, which explains that "en banc proceedings are *extraordinary* and will be ordered only in the enumerated circumstances." *In re Rule 9.331, Determination of Causes by a Dist. Ct. of Appeal En Banc, Fla. R. App. P.*, 416 So. 2d 1127, 1130 (Fla. 1982) (emphasis added). There is also no indication that the district courts of appeal have misused or misapplied the rule. By whatever definition one might use, the en banc process is the exception and not the rule; the vast majority of the many thousands of cases resolved by Florida's district courts each and every year are resolved by three-judge panels and not en banc.

The Florida Supreme Court has previously granted the district courts of appeal broad discretionary authority to apply the "unless necessary to maintain uniformity in the court's decisions" component of the en banc rule. *See Chase*, 479 So. 2d at 93-94 ("The en banc process now authorized for the district courts is designed to

39

help the district courts avoid conflict, assure harmonious decisions within the courts' geographic boundaries, and develop predictability of the law within their jurisdiction. . . . We [previously] expressly granted the district courts broad discretionary authority 'to develop their own concept of decisional uniformity' to be able to fully carry out these expressed purposes. . . . We hold that the district court of appeal, in implementing the provisions of appellate procedure rule 9.331, has authority to adopt the standard of conflict it believes necessary or appropriate in order to harmonize the decisions of the court and avoid costly relitigation of similar issues within its appellate district." (citations omitted)). It follows that the district courts of appeal maintain the same discretionary authority to apply the "case or issue is of exceptional importance" component of the en banc rule on a case-by-case and issue-by-issue basis. This makes sense. Although district courts rarely determine cases or issues en banc, the types of circumstances, both factual and legal, that might justify a district court deciding a case or issue en banc, are varied and unknowable in the abstract. That the Florida Supreme Court has made few substantive changes to the en banc rule since its inception in 1980 suggests that the en banc rule is performing as intended. *See generally, e.g.*, *In re Amends. to Fla. R. App. P.-2017 Regular-Cycle Report*, 256 So. 3d 1218 (Fla. 2018) (en banc rule amended to allow a district court to initiate an en banc proceeding where an "issue" is of exceptional importance); *In re Amends. to Fla. R. App. P.*, 183 So. 3d 245 (Fla. 2014) (en banc

rule amended to allow a party to request en banc rehearing where an "issue" is of exceptional importance); *The Fla. Bar Re R. App. P.*, 463 So. 2d 1114 (Fla. 1984) (en banc rule amended to allow en banc proceedings where a "case is of exceptional importance"); *In re Rule 9.331, Determination of Causes by a Dist. Ct. of Appeal En Banc, Fla. R. App. P.*, 416 So. 2d 1127, 1127 (Fla. 1982) (en banc rule and commentary amended to "address practical problems [that had] arisen in the in the en banc decisional process under the en banc rule," including "the number of judges of a district court of appeal necessary to constitute a 'majority' in terms of an en banc panel"); *In re Rule 9.331, Determination of Causes by a Dist. Ct. of Appeal En Banc, Fla. R. App. P.*, 377 So. 2d 700 (Fla. 1979) (amended version of original en banc rule that took effect January 1, 1980, and was enacted to allow en banc proceedings only when "necessary to maintain uniformity in the court's decisions"); *In re Rule 9.331, Determination of Causes by a Dist. Ct. of Appeal En Banc, Fla. R. App. P.*, 374 So. 2d 992 (Fla. 1979) (original version of en banc rule that was scheduled to take effect January 1, 1980).

I find myself persuaded by the reasoning of former Judge Padovano regarding the exceptional importance component of the en banc rule and how district courts of appeal should approach it. Again, because I can do no better, I quote former Judge Padovano extensively below:

> It is true . . . that the term "exceptional importance" is not defined in Rule 9.331, but I do not think that it is such a bad thing that appellate

41

judges are left to use their own judgment about this. Perhaps we have become so accustomed to guidelines and standards imposed by others that we have begun to think that we cannot judge without them. I don't think that is the case. To the contrary, I think that this is an area that is best left to the discretion of appellate judges.

It appears to me that the Florida Supreme Court did not intend to interject itself into the day-to-day application of the en banc rule, but rather that the court thought it would be best to allow the district courts to interpret and apply the rule on their own. This conclusion is supported by the supreme court's decision in *Chase Federal Savings & Loan Association v. Schreiber*, 479 So. 2d 90 (Fla. 1985). There the court held that the district courts are free to develop their own standard of decisional uniformity in deciding whether to grant en banc hearings and rehearings. It is logical to assume that the supreme court holds the same view about the proper interpretation and application of the term "exceptional importance." This part of the rule was added after the decision in *Chase*, but the general point is the same. The supreme court recognized that en banc review is a matter for the district courts.

The supreme court could have defined "exceptional importance" in the text of rule 9.331, but it did not. I think it was wise to avoid such a definition. To say what exceptional importance is would also say what it is not. A limiting definition might prevent this court from correcting its own errors in some cases. In any event, I think this case plainly a case of exceptional importance. Even without the explanation I have given for my own vote, it should be obvious to anyone who is trying to untangle all of the opinions that have been written in this case both on the merits and with respect to the en banc procedure that the case is very important.

It is true that there is an element of subjectivity in separating cases that are of exceptional importance from those that are not. Different judges will have different views about this. But we should not overlook the fact that a case cannot be heard en banc unless a majority of the judges think that it is one of exceptional importance. It is not as though one judge or two or even five can do this with their own subjective opinions about what is important. With all due respect, I think that if a majority of the judges on this court think that this case is a case of exceptional importance, those judges who disagree should

42

simply accept the court's decision. It does the judicial system no good to question why some judges believed it was proper.

> I would be concerned about the absence of standards for the definition of the term "exceptional importance" if there were some evidence that the en banc rule was being abused, but there is not. . . . [S]tatistics show that the exceptional importance provision in the en banc rule is not being used capriciously and that it is not being used merely to express disagreement with a panel decision. This court and other appellate courts have been very careful to use this provision only when it is necessary to resolve cases of exceptional importance.

*Childers v. State*, 936 So. 2d 619, 632-33 (Fla. 1st DCA 2006) (Padovano, J., concurring).

In closing, the en banc rule provides district courts of appeal with flexibility to decide for themselves whether a given case or issue is en banc worthy. As Florida's newest district court of appeal, I believe that the Sixth District is well-positioned to thoughtfully examine the meaning of the en banc rule, including its "case or issue is of exceptional importance" component. In this case, we have begun to do just that.

With these observations, and with sincere respect for my colleagues, I have voted to determine this case en banc, and I fully concur in the majority's decision.

---

WOZNIAK, J., dissenting.

About a month after a majority of this Court voted to take this case en banc, the parties settled it, and The Bank of New York as Trustee for the Certificateholders

43

CWABS Asset-Backed Certificates, Series 2005-BC4 (the "Bank") filed a notice of voluntary dismissal. *See* Fla. R. App. P. 9.350. While I acknowledge the significant court resources that go into any en banc proceeding, and the thorough opinions that have resulted from this one, I would respect the parties' decision to reach an accord outside the litigation process. *See, e.g.*, *Shands Jacksonville Med. Ctr. v. Chavez*, 416 So. 3d 1226, 1226-27 (Fla. 1st DCA 2025) (withdrawing opinion upon reconsideration of Appellants' notice of voluntary dismissal and entering order of dismissal); *Swift Response, LLC v. Routt*, 401 So. 3d 640, 648 (Fla. 1st DCA 2025) (Long, J., concurring in result only) ("I would dismiss this case, but for a different reason. On June 23, 2023, Petitioner filed a notice of voluntary dismissal under Florida Rule of Appellate Procedure 9.350(b)."). Because I would dismiss this case, I respectfully dissent.

I first observe that while the Bank improperly proceeded to dismiss under rule 9.350(b), this does not alter my conclusion. Rule 9.350(a) requires a stipulation for dismissal, not notice, when parties have settled. Fla. R. App. P. 9.350(a) ("When any cause pending in the court is settled before a decision on the merits, the parties shall immediately notify the court by filing a signed stipulation for dismissal."). I would strike the notice without prejudice and allow the parties to file the appropriate stipulation for dismissal.

I next acknowledge that rule 9.350 gives the majority discretion to issue its ruling following the parties' settlement. *See Pino v. Bank of N.Y.*, 76 So. 3d 927, 927 (Fla. 2011). But I do not believe that this exercise of discretion is appropriate here. The *Pino* Court concluded that it should not dismiss a foreclosure action because the questions raised in it were of great public importance and likely to recur. *Id*. at 929. This case does not meet those benchmarks; indeed, the majority does not certify a question of great public importance for the Florida Supreme Court to decide. And this case's fact pattern is unique, not common. In any event, the requisite import to either proceed en banc or certify a question to the Florida Supreme Court is not necessarily reason enough to refrain from dismissing. *See, e.g.*, *Stalley v. Boozer*, 168 So. 3d 228, *1 (Fla. 2015) (unpublished table decision) (granting parties' motions to dismiss and discharging review after previously accepting jurisdiction to review a question certified by an en banc opinion of the Fifth District Court of Appeal to be of great public importance).

"[S]ettlements are highly favored and will be enforced whenever possible." *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985) (citing *Pearson v. Ecological Sci. Corp.,* 522 F.2d 171 (5th Cir. 1975)); *see also Dozier v. Scruggs*, 380 So. 3d 505, 508-09 (Fla. 5th DCA 2024) ("[S]ettlement allows the parties to steward their own affairs . . . ."). Because the parties should be allowed to reach a private resolution of this case outside the litigation context, I respectfully dissent.

TRAVER, C.J., and STARGEL, WHITE and SMITH, JJ., concur.

---

SMITH, J., dissenting.

While I join in Judge Wozniak's dissent that this matter should have been dismissed based upon the voluntary settlement of the parties, I also note that the substance of the majority's opinion involves matters not squarely raised by either party below or here in this appeal. While there may be times when "prudence dictates to the contrary" as a general matter "the refusal to consider arguments not raised is a sound prudential practice." *Davis v. United States*, 512 U.S. 452, 464 (1994) (Scalia, J., concurring). Because these issues needed not be reached to resolve this appeal and were neither sufficiently raised below nor presented by the parties, sound prudential practice firmly weighs against consideration of (i) whether injustice is an additional element in vacating a foreclosure sale, and (ii) whether injustice occurred in this case.

As evidenced by the majority opinion, even if the parties had not reached a settlement, this matter was simply resolved on the sole issue presented below and on appeal—whether the facts supported the trial court's finding that no irregularity existed in the foreclosure sale.[13] This Court needed not go beyond that point to

---

[13] The lower court's order denying the motion to vacate the foreclosure sale constituted a single substantive paragraph which reads:

46

affirm the lower court's ruling.  Instead, we have, as one of our concurring members put it, decided an "issue [that] will affect every one of the thousands of foreclosure sales conducted every year across Florida, with obvious effects on our trial courts, the banking industry and the real estate industry."  *Ante*, at 25 (Mize, J., concurring).[14]  And we have done so without input of the parties, or the individuals, or industries in our state that may be so affected.

---

The Osceola County Clerk of Court in charge of the foreclosure sale in the instant case on June 13, 2024 did not bar or otherwise prevent Plaintiff's representative from Auction.com from bidding in excess of the Final Judgment amount of $246,488.76.  However, the Clerk of Court advised the attending representative an affidavit was needed prior to the sale date to bid over the Judgment amount.

As shown, the order is limited to a factual finding of no procedural irregularity existing in the sale, with no mention of finding inequity or injustice.

[14] Our federal counterpart, the Eleventh Circuit Court of Appeals, recently considered an issue en banc that was not raised in the parties' briefs.  In *United States v. Campbell*, 26 F.4th 860 (11th Cir. 2022), the appellate court opted to consider the good-faith exception when deciding an appeal related to a motion to suppress.  *Id.* at 865.  In its en banc briefing notice, the Eleventh Circuit provided the parties an opportunity to brief the good-faith exception issue.  *Id.*  I believe it would have been prudent to give the parties the same opportunity here, particularly to discuss whether "injustice" should be treated as a separate element when moving to vacate, and, if so, whether "injustice" was shown under these facts.  I recognize that there were exigencies expressed by Mr. Henry regarding the need to be given quick access to the subject property to conduct repairs.  However, if exigency was the basis for not giving the parties an opportunity to provide supplemental briefing, then the more appropriate path to take would have been to refrain from addressing an unnecessary issue—that being "injustice"—and limit the opinion to reviewing the lower court's factual finding of no procedural irregularity.  As much benefit as the majority may feel it is providing by addressing the potential existence of a separate legal element of "injustice" in foreclosure proceedings and helping to define that term, it could

I do, admittedly, have concerns with the express insertion of an injustice requirement that is largely left undefined by the majority other than to say, "it is not present in this case." *Majority op.* at 17 ("We need not, and do not, decide all the types or measures of injustice that may warrant set-aside; we only decide that the bank offered no evidence of any type or measure whatsoever."). Must a party now separately list "injustice" as an element in a motion to vacate a sale, or is that something the trial court will merely need to discern from the evidence as it is submitted at the hearing? Will simply reciting the word "injustice" in the motion to vacate be sufficient, or will a party need to articulate what exactly constituted "injustice" (in addition to whatever equitable factor the party asserts) in the sale process? As for sufficient evidence of injustice, where does the spectrum of injustice end – for example, is it when a party asserts a mistake or surprise in the bidding time? When a sale is scheduled for 11:00 a.m., but actually occurs at 9:00 a.m., what must the potential bidder show to demonstrate injustice? Must they show that the potential bidder would have attended at 9:00 a.m. and placed a bid? Must they show that the potential bidder would have attended at 9:00 a.m. and won the bid? Must they show that the property sold for less than the potential bidder was prepared to bid? Must they show that the potential bidder would have been able to sell the

---

equally and unknowingly be doing as much harm. Ultimately, the "juice" is not "worth the squeeze." *Miccosukee Tribe of Indians v. Lewis Tein, P.L.*, 227 So. 3d 656, 668 (Fla. 3d DCA 2017).

property for more than the winning bid?  Having the parties' input as to these questions I believe would have been helpful.

I would have also appreciated hearing from the parties as to whether *Arsali v. Chase Home Fin. LLC*, 121 So. 3d 511 (Fla. 2013), engrafts an additional injustice requirement onto a proper showing of inequity.[15]  The *Arsali* court identified—in a non-exhaustive list—equitable grounds upon which injustice, i.e., the inequity, may be found.[16]  By requiring an additional showing of injustice beyond the threshold inequity, the majority may be placing a loftier burden on the movant than was required by *Arsali*.

---

[15] The majority appears to take this "resulting injustice" language from *Arlt v. Buchanan*, 190 So. 2d 575, 577 (Fla. 1966); however, *Arsali* expressly clarified that it "was not then establishing the basis for a test . . . ." *Arsali*, 121 So. 3d at 516.

[16] "Inequity" is defined as "[u]nfairness; a lack of equity" and "[a]n instance of injustice." *Inequity*, *Black's Law Dictionary* (12th ed. 2024).  This is the identical definition of inequity that first appeared in *Black's* in 2009.  *Inequity*, *Black's Law Dictionary* (9th ed. 2009).  Although the 1957 and 1968 editions of *Black's* do not include a definition for inequity, they define "equity" as "denot[ing] the spirit and the habit of fairness, justness, and right dealing . . . ." *Equity*, *Black's Law Dictionary* (4th ed. 1957) & (rev. 4th ed. 1968).  *Black's* is not alone in its equation of inequity with a lack of justice.  *See, e.g.*, *Inequity*, *The Am. Heritage Dictionary of the English Language* 672 (2d ed. 1969) (defining inequity as the [l]ack of equity; injustice, unfairness" and "[a]n instance of injustice or unfairness"); *Inequity*, *New Oxford Am. Dictionary* 888 (3d ed. 2010) (defining inequity as "lack of fairness or justice"); *see also Degge v. First State Bank of Eustis*, 199 So. 564, 565 (Fla. 1941) ("*Equity* came into existence as a means of granting *justice* in cases wherein the law by its rigid principles was deficient." (emphasis added)).

Adam A. Diaz, of Diaz Anselmo & Associates, P.A., Fort Lauderdale, for Appellant.

Keith Henry, Kissimmee, pro se.

No Appearance for Other Appellees.